## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

MESHELLA T.,[1]

      **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　**Case No. 3:21-CV-314-NJR**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Meshella T., through counsel, seeks judicial review of the final agency decision denying her application for Supplemental Social Security (SSI) benefits pursuant to 42 U.S.C. § 423.

### PROCEDURAL HISTORY

On September 11, 2014, Plaintiff's mother applied for SSI benefits on her behalf. (Tr. 120.) Plaintiff's claim for disability was based on ADHD, depression, mood disorder, bipolar disorder, anxiety disorder, and mild intellectual disability. (*Id.*) The application initially was denied on January 20, 2015, and was denied upon reconsideration on September 24, 2015. (Tr. 42.) Plaintiff timely requested a hearing, and a video hearing was held before Administrative Law Judge Jason R. Yoder on June 20, 2017. (Tr. 42, 67.)

The ALJ issued an unfavorable decision on January 9, 2018, finding that Plaintiff

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

had not been disabled as a child under Section 1614(a)(3)(C) and was not disabled as an adult under Section 1614(a)(3)(A) of the Social Security Act. (Tr. 39-61.) The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 30-34.) Plaintiff now appeals that decision directly to this Court, pursuant to 42 U.S.C. § 1383(c) and 20 C.F.R. § 404.984.

## ISSUES RAISED BY PLAINTIFF

Plaintiff raises four issues:

1. Whether the ALJ improperly evaluated Plaintiff's functional equivalency as a child where the ALJ failed to consider or address evidence that supports a finding of greater functional limitations.

2. Whether the ALJ's analysis of Plaintiff's functioning as an adult is fundamentally flawed where the ALJ failed to reach a finding regarding the consistency of Plaintiff's allegations of the nature, severity, and limiting effects of her subjective symptoms.

3. Whether the ALJ improperly rejected the opinion of Gabe Martin, PA, where the ALJ's rationale was factually incorrect and legally insufficient.

4. Whether the ALJ's Step Five finding is not supported by substantial evidence where it is based on an incomplete and inadequately supported RFC assessment.

## LEGAL STANDARD

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(a).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth three sequential steps used to determine whether a child is disabled. 20 C.F.R. § 416.924. First, the ALJ considers whether the child is doing substantial gainful activity. *Id.* If so, the child is not disabled, and the claim will not be reviewed further. *Id.* Second, if the child does not have a severe medical impairment or combination of impairments, then the child is not disabled, and the claim will be denied. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). Third, if the impairments are severe, the ALJ determines whether the impairments meet, medically equal, or functionally equal any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1. *Id.*

For adults, there are five questions for the ALJ to consider in assessing whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his or her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the

claimant is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The claimant bears the burden of proof at steps one through four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

Once an assessment has been made and a claimant appeals a denial, the Court may only review the Commissioner's decision to ensure it is supported by substantial evidence and that the Commissioner made no mistakes of law. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Supreme Court defines substantial evidence as "more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). "Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence." *B. v. Comm'r of Soc. Sec.*, No. 17-cv-1243-DGW, 2020 WL 230594, at *4 (S.D. Ill. Jan. 15, 2020).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but the Court will not reweigh the evidence, assess credibility, or otherwise substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d

507, 510 (7th Cir. 2019). The ALJ need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, it makes it impossible for a district court to assess whether the ruling rested on substantial evidence and requires the court to remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

## I.  Evidentiary Hearing

Plaintiff was represented by an attorney at the hearing on July 20, 2017. Plaintiff's mother and an impartial vocational expert also appeared and testified. (Tr. 67-119.)

Plaintiff, age 19 at the time of the hearing, testified that she graduated from high school about a month before the hearing. (Tr. 73.) Plaintiff was held back in kindergarten for being "too slow to move on," and she started special education in first grade. (*Id.*) Throughout elementary, middle, and high school, Plaintiff had an individualized education program (IEP). (Tr. 95.) While Plaintiff can read and write, she testified that she cannot read very well. (*Id.*) She can do simple math with the use of a calculator. (Tr. 74.) Plaintiff testified she was never prepared for any kind of job, never learned how to write a resume, and never learned how to interview. (Tr. 95-96.) She had a job in junior high but "it didn't work out." (Tr. 72-73.)

Plaintiff had some months where she got along with her teachers, but there were

more months where she did not. (*Id.*) Plaintiff felt the teachers were not doing their job correctly, and she would have to teach herself what she already knew from previous years in school. (Tr. 75.) Plaintiff had some friends in school but mostly hung around with her sister, who was two years younger. (Tr. 76.)

At the time of the hearing, Plaintiff testified that she had her driver's license, but she did not have a car to drive. (Tr. 77.) She also was nervous to drive, but stated that when she moved out on her own, she would work her way up to driving. (*Id.*)

Plaintiff takes medication for her depression and anxiety. (Tr. 83.) She testified that the medications help her but that she gets anxious when doing something outside her normal routine. (Tr. 83.) Plaintiff's dog also helps her through days where she is feeling depressed or anxious. (Tr. 79.) The dog warns her before her depression and anxiety becomes severe and lets her know it's okay. (Tr. 80.) Plaintiff's dog was not trained for that specific reason, but he "picked it up" on his own. (*Id.*)

Plaintiff can shower, bathe, brush her teeth, and otherwise attend to her personal care needs. (*Id.*) Sometimes her mom has to remind her to brush her teeth. (*Id.*) She started cooking at age 14 and can make easy items like macaroni, hot dogs, and baked beans. (Tr. 81.) She goes to the grocery store with her family. (Tr. 84.) Plaintiff testified that she enjoys drawing and writing in a journal. (*Id.*) Plaintiff also testified that most days she lays around the house, picks up after herself, and plays with her dog. (Tr. 88.)

On January 28, 2017, Plaintiff had a baby. (Tr. 90.) Plaintiff testified that she is not left alone with the baby; usually her siblings or cousin are home with her. (Tr. 91.) Plaintiff changed the baby's diapers, but her mother would bathe the baby. (*Id.*)

Plaintiff testified that the number one issue keeping her from working is her ADHD and anxiety. (Tr. 97.) Because of her ADHD, Plaintiff cannot focus or concentrate on something for more than a matter of minutes. (*Id.*) Plaintiff also has "a little of both" depression and bipolar disorder. (Tr. 98.) Her manic episodes last an hour, while her lows last 10 to 30 minutes, though some days her lows last a few hours. (Tr. 98-99.) Plaintiff explained she knows she's depressed because she feels a knot in her chest and experiences negative thoughts about not being good enough or nobody wanting her here. (Tr. 99.) She also has thought about self-harming. (Tr. 100.) When having a manic or depressed moment, Plaintiff cries it out or hugs her dog. (Tr. 101.) Plaintiff also testified that she has night terrors every night of the week and needs a light on in order to sleep. (Tr. 101-02.) According to Plaintiff, there are three to four nights a week where she gets no sleep at all. (Tr. 102.)

Plaintiff's mother, Sherisa, also testified at the hearing. Sherisa testified Plaintiff has seen Gabe Martin, a psychiatric Physician's Assistant, since the age of six. (Tr. 108.) PA Martin changed Plaintiff's medication or dosage four times between 2014 and 2017 due to behavioral, anxiety, and concentration issues. (Tr. 108-09.) Sherisa further testified that Plaintiff cannot complete simple chores around the house like dusting, vacuuming, laundry, and dishes because she loses focus. (Tr. 109-10.) They also have to remind her to take her medicine, brush her teeth, and take out her dog. (Tr. 110.)

With regard to Plaintiff's child, Sherisa testified that Plaintiff initially took care of the baby but would constantly call Sherisa, saying she "can't do this" and expressing frustration that she didn't understand why the baby was crying. (Tr. 106.) After two

weeks, Sherisa took temporary guardianship over the child until she could finish the process of legal guardianship. (Tr. 106-07.) When asked what the difference was between Plaintiff and any other teenager who has a baby, Sherisa said Plaintiff has "to put a lot of focus and a lot of time into trying to figure out what time she fed last and things like that, whether or not she burped her, whether she's burping her right. And it just becomes too overwhelming, more so than she even knows what to deal with." (Tr. 108.)

According to Sherisa, Plaintiff cannot work because she has no sense of time. (Tr. 111.) She also cannot focus and stay on task, and her short-term memory prevents her from remembering what her job is to do. (Tr. 113.) Sherisa testified that she does not allow Plaintiff to drive because she gets too excited, which breaks her concentration. (*Id.*)

Vocational witness Robert Breslin also testified at the hearing. Breslin testified that Plaintiff could perform some occupations that exist in the national economy including industrial cleaner, kitchen helper or dishwasher, or hand packager. (Tr. 116-17.) When asked if an individual could perform these jobs if they were off task 15 to 20 percent of the workday due to an inability to focus or remember instructions, Breslin testified that no employer would find that level of productivity acceptable. (*Id.*) Breslin also was asked whether an employee could perform these jobs if they required significant additional supervision or if they were off task when not being supervised. (Tr. 118.) Breslin testified that most employers would find this unacceptable in the competitive employment environment, and that this level of supervision was more characteristic of supported employment or sheltered employment. (*Id.*)

Melodee Garner, Plaintiff's special education teacher, provided a Teacher

Questionnaire dated December 19, 2014. (Tr. 253.) As for acquiring and using information, Garner reported that Plaintiff needs a lot of assistance from teachers and directions must be repeated multiple times. (Tr. 254.) According to Garner, Plaintiff struggles with all math concepts including basic addition and subtraction, as well as counting money. (*Id.*) She also has serious problems with expressing ideas in written form and applying previously learned material, and she has very serious problems with providing oral explanations and adequate descriptions, as well as with applying problem-solving skills. (*Id.*)

For attending and completing tasks, Garner reported that Plaintiff has a very serious problem with carrying out multi-step instructions, and serious problems with refocusing to task and completing work accurately without careless mistakes. (Tr. 255.) Garner stated that Plaintiff struggles to stay focused in class and will interrupt the teacher to tell a story that is unrelated to the lesson. (*Id.*)

Garner reported that Plaintiff has no issues with interacting and relating with others and no issues with moving about and manipulating objects. (Tr. 256-57.) Garner also reported that Plaintiff has no serious or very serious problems with caring for herself. (Tr. 258.) Plaintiff does, however, have obvious problems with handling frustration appropriately, being patient, asserting her emotional needs, and knowing when to ask for help. (*Id.*) According to Garner, Plaintiff does not handle frustration in an appropriate way, but rather becomes loud and vocal. (*Id.*)

## II.    Relevant Medical Records

Plaintiff was treated by PA Martin for her ADHD, depression, mood disorder,

bipolar disorder, and anxiety disorder. Throughout 2014 and 2015, Plaintiff often reported hyperactivity, impulsivity, inability to focus and finish tasks, agitation, and having very few friends. (*See, e.g.*, Tr. 399.) Plaintiff was hospitalized in May 2014 for suicidal ideations and cutting. (Tr. 462-68.)

Upon physical examination, PA Martin, many times, found Plaintiff to be well-groomed, cooperative, oriented to situation, time, and place, alert, and memory intact. (*Id.*) Her mood was euthymic and her affect was pleasant. (*Id.*) Her intelligence was below average. (*Id.*) A January 31, 2014 Progress Note by PA Martin states that Plaintiff is "doing well in school" and getting all As and Bs. Her mood was stable, and she had "no complaints." (Tr. 323.) In May 2015, however, PA Martin found Plaintiff to be agitated, irritable, angry and tearful. (Tr. 546.) Her insight and judgment were impaired, and her through processes were tangential. (*Id.*) But by June 2015, PA Martin performed another exam and found Plaintiff once more to be cooperative, calm, oriented, pleasant, and euphoric. Her insight and judgment were intact. (Tr. 543.) Her intelligence was, again, below average. (*Id.*)

Dr. Fred Klug performed a psychological consultation upon request of the ALJ on July 27, 2017. (Tr. 720.) Dr. Klug found that Plaintiff's reasoning was poor, abstract thinking was poor, and judgment and insight were poor. (Tr. 720-21.) Plaintiff also underwent intelligence testing at the request of the ALJ. (Tr. 722.) Plaintiff attained a verbal comprehension IQ score of 72, a perceptual reasoning IQ score of 69, a working memory IQ score of 71, a processing IQ score of 79, and a full-scale IQ score of 67, which falls within the mild range of intellectual disability. (*Id.*) Her full-scale IQ score indicates

she is functioning at a level below that of 99% of her peers. (Tr. 723.) It was Dr. Klug's opinion that Plaintiff should not manage her own funds. (*Id.*)

### III.    School Records

The ALJ considered Plaintiff's IEP review from October 2014, which noted that Plaintiff was functioning below the average range in all academic areas. (Tr. 326.) As part of her IEP review, Plaintiff was observed in her biology class. (*Id.* at 327.) A "momentary time sampling of attention to task" found that Plaintiff remained on task for 97% of the observation time. (Tr. 326.) She exhibited appropriate social interaction, appropriate eye contact, and an appropriate sense of humor. (*Id.*) She was able to follow directions and complete activities. (*Id.*)

Plaintiff's teachers completed the Behavior Rating Inventory of Executive Function (BRIEF). (*Id.*) The results indicated Plaintiff could control her impulses and consider the possible consequences of her actions, although she had trouble with emotional control. (*Id.*) She also needed prompting to begin activities, she had difficulty planning and organizing, and she had difficulty checking her work for accuracy. (*Id.*) With regard to cognitive functioning, Plaintiff was in the low average range in overall cognitive ability. (Tr. 327.) Her verbal comprehensive was average, her perceptual reasoning and processing speed were low average, and her working memory was significantly below average. As to her emotional status and social functioning, Plaintiff's anxiety continued to be a concern for the staff at her high school. (Tr. 329.) She had difficulty getting along with other students in the past, but stated that "people don't bug me this year." (*Id.*)

Plaintiff was described as a hard-working student who wants to do well and tries

her best the majority of the time. (Tr. 334.) She likes to help others and makes efforts to keep herself organized. (*Id.*) She also asks for help when she needs it, has a positive attitude, and participates in class. (*Id.*) At the time of the IEP renewal, Plaintiff was passing all of her classes and completing her homework the majority of the time, but teachers were concerned with her ability to comprehend test questions. (*Id.*) Although she was in 10th grade, she was reading at a 5th grade level. (*Id.*)

In October 2016, during Plaintiff's senior year of high school, another IEP review was performed. Plaintiff was found to have a 9th grade level in vocabulary and an 8th grade level in reading comprehension. (Tr. 621.) Plaintiff was "aware of her deficit areas and work[ed] hard to compensate for them." (*Id.*) She had As and Bs in her classes, with the exception of a C in Art III. (*Id.*) At the time of the IEP review, Plaintiff was pregnant and only attending school part-time. (*Id.*)

## IV.    State Agency Examiners

In January 2015, David Voss, Ph.D., reviewed the record for a childhood disability evaluation. (Tr. 120-30.) Dr. Voss found that Plaintiff's impairments or combination of impairments were severe, but did not meet, medically equal, or functionally equal the listings. (Tr. 126.) Specifically, the mental allegations were only partially consistent with the medical records and, therefore, were only partially credible. (*Id.*) He found that the extent of the limitations alleged exceeded that supported by the weight of the overall findings. (*Id.*) Accordingly, Dr. Voss determined Plaintiff was not disabled. (Tr. 127.)

In September 2015, M. W. DiFonso, Psy.D., reviewed the record upon reconsideration of the disability determination. (Tr. 131-43.) Dr. DiFonso noted that while

Plaintiff reported a worsening of conditions, the medical evidence of record did not show any significant changes, and her allegations were still considered to be only partially credible. (Tr. 138.) Accordingly, affirmation of the original determination of not disabled was appropriate. (*Id.*)

## DECISION OF THE ALJ

In reaching his decision, the ALJ considered hearing testimony from Plaintiff, her mother, and the impartial vocational expert. The ALJ also considered Plaintiff's medical records, her school records, including a statement from Plaintiff's special education teacher, and the opinions of Dr. Voss and Dr. DiFonso.

Because Plaintiff was in the "Adolescents (age 12 to attainment age of 18)" age group on the date the application was filed, the ALJ first considered whether Plaintiff met the disability standard for child's benefits under the three-step sequential evaluation set forth in 20 C.F.R. § 416.924. (Tr. 46-55.)

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity. (Tr. 46.) At step two, the ALJ determined that Plaintiff's ADHD, depression, mood disorder, bipolar disorder, anxiety disorder, and mild intellectual disability constituted severe impairments. (Tr. 47.) At step three, the ALJ determined that Plaintiff's impairments, alone or in combination, did not meet, or medically or functionally equal, the criteria of a listed impairment. (*Id.*) Specifically, the ALJ found there were not two marked or one extreme limitation in the six domains of function: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for

yourself; and (6) health and physical well-being. (Tr. 47-55.) Therefore, she had not been disabled prior to her 18th birthday.

Plaintiff reached age 18 on November 24, 2015; thus, the ALJ also considered whether Plaintiff met the adult standard for disability from that date through the ALJ's decision on January 9, 2018. (*Id.*) Applying the adult disability standard to the period after Plaintiff's 18th birthday, the ALJ again found that Plaintiff's impairments do not meet or equal a listed impairment. (Tr. 56.) The ALJ found that Plaintiff had only moderate limitations in the four broad "paragraph B" areas of functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing themselves. (Tr. 55-56.)

The ALJ found that, since reaching age 18, Plaintiff has had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, with the following non-exertional limitations:

- Plaintiff can understand and remember simple instructions and carry out simple, routine, and rote type tasks that require little independent judgment or decision making;

- Plaintiff can perform this work for two-hour segments at a time with a short 10- to 15-minute rest break between the two-hour segments;

- Plaintiff can perform tasks at an average production rate but never perform tasks with stringent speed or strict rate-based production requirements involving few, if any, daily changes in work tasks or a work environment;

- Change, when necessary, is introduced gradually; and

- Only occasional interaction with others, including the public, coworkers, and supervisors. (Tr. 57.)

Further, based on the testimony of the vocational expert, the ALJ found that Plaintiff was able to perform a significant number of jobs in the national economy, including the three representative jobs of industrial cleaner, kitchen helper/dishwasher, and hand packager. (Tr. 60, 114-17.) Thus, Plaintiff is not disabled as defined in the Social Security Act.

DISCUSSION

## I.    The ALJ's Functional Equivalency Analysis

Plaintiff argues that the ALJ erred in finding that her impairments as a child did not functionally equal a listing. Plaintiff first asserts the ALJ ignored evidence that supports greater functional limitations in the domain of attending and completing tasks. Specifically, the ALJ did not consider evidence that Plaintiff required accommodations in order to achieve and advance in school. Plaintiff asserts that the evidence of accommodations and academic support show that, while she was able to graduate high school, she needed substantial amounts of support, social work, and medication to do so.

Second, Plaintiff argues the ALJ failed to discuss her medical records from prior to the age of 18, which show she routinely struggled at school with hyperactivity, impulsivity, irritability, anger, anxiety, the inability to finish tasks, agitation, and the inability to maintain friendships and relationships. Plaintiff claims this evidence must be considered in assessing the domain of interacting and relating with others, and the ALJ's failure to do so was error.

### A.  Attending and Completing Tasks

Attending and completing tasks refers to how well the child is able to focus and

maintain his attention, and how well he begins, carries through, and finishes his activities, including the pace at which he performs activities and the ease with which he changes them. 20 C.F.R. § 416.926a(h); *Hopgood*, 578 F.3d at 700-01. Adolescents should be able to pay attention to increasingly longer presentations and discussions, maintain concentration while reading textbooks, independently plan and complete long-range academic projects, organize materials and plan time to complete school assignments. 20 C.F.R. § 416.926a(h)(2)(v). They should also be able to maintain attention on a task for extended periods of time and not be unduly distracted by peers or unduly distracting to them in a school or work setting. *Id.*

While Plaintiff claims the ALJ ignored evidence demonstrating a greater limitation in her ability to attend to and complete tasks, the Court disagrees. In finding that Plaintiff had a less than marked limitation in attending and completing tasks prior to reaching the age of 18, the ALJ relied on evidence from PA Martin that Plaintiff had no complaints and was making As and Bs in school in January 2014. He also relied on the IEP annual review from October 2014 in which Plaintiff remained on task for 97 percent of the observation time, demonstrated age-appropriate social interactions, paid attention, and followed directions. She also was noted to be a hard-working student who tried her best and made all efforts to stay organized. The ALJ also referred to the Teacher Questionnaire completed by Plaintiff's special education teacher, Melodee Garner, in which Ms. Garner reported that Plaintiff struggled to stay focused in class. Ms. Garner noted Plaintiff had a very serious problem carrying out multi-step instructions, an obvious problem with single-step instructions, and only slight problems with paying attention when spoken to

directly. In addition, both Plaintiff and Plaintiff's mother reported that medication helped her to focus and stay on task. Her IEP review from October 2016 showed she was an excellent student who stayed on task, followed directions, and completed her homework. Finally, the reviewing psychologists, Dr. Voss and Dr. DiFonso, assessed a less than marked limitation in this domain based on Plaintiff's ADHD diagnosis, difficulty with attention, and the teacher questionnaire.

In determining Plaintiff had a less than marked limitation in attending and completing tasks, the ALJ noted and considered the evidence that was more favorable to Plaintiff, but then explained why that was outweighed by other evidence noted above. For these reasons, the Court finds that substantial evidence supports the ALJ's conclusion.

### B.  Interacting and Relating with Others

Interacting and relating with others refers to how well the child initiates and sustains emotional connections with others, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). An adolescent should be able to initiate and develop friendships with same-aged children, relate appropriately to other children and adults, and begin to be able to solve conflicts between himself and peers or family members or other adults. 20 C.F.R. § 416.926a(i)(2)(v). The child should be able to express his feelings and follow social rules for interaction and conversation. *Id.*

The ALJ found Plaintiff had a less than marked limitation in this domain. The ALJ relied on Plaintiff's IEP reviews in 2014 and 2016, in which it was noted that Plaintiff was

able to appropriately interact with other students, initiate conversations, help other students and teachers, and participate in class discussions. The ALJ also referred to Ms. Garner's finding that Plaintiff did not have any problems interacting and relating with others. Finally, the ALJ relied on the State agency examiners' finding that Plaintiff had a less than marked limitation in this domain.

Plaintiff argues the ALJ ignored evidence from PA Martin's medical records, which indicate Plaintiff had very few friends and was unable to keep or maintain relationships. Plaintiff claims the failure to consider this evidence was error.

The Court disagrees. The records Plaintiff refers to are her own subjective complaints contained in PA Martin's records, which themselves are inconsistent. For example, on September 25, 2014, and October 23, 2014, Plaintiff reported being well connected with her peers. (Tr. 399, 401.) Thus, this is not an instance where an ALJ ignored a whole line of evidence contrary to the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003). The ALJ's decision was supported by substantial evidence.

## II.   The ALJ's Evaluation of Plaintiff's Subjective Symptoms

Plaintiff next argues ALJ erred as a matter of law by failing to reach an explicit finding regarding the consistency of Plaintiff's allegations of the nature, severity, and limiting effects of her subjective symptoms. That is, while the ALJ discussed Plaintiff's testimony regarding her subjective symptoms, the ALJ did not make an explicit finding regarding the weight he placed on those allegations. Plaintiff also argues the ALJ failed to weigh Sherisa's testimony regarding Plaintiff's functioning after her 18th birthday. Specifically, Plaintiff alleges, the ALJ failed to consider Sherisa's testimony that Plaintiff

needed to frequently be redirected, prompted, or reminded on how to perform basic tasks in order for her to complete those tasks.

"When evaluating credibility, the ALJ must 'consider the entire case record and give specific reasons for the weight given to the individual's statements.'" *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012) (quoting *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009)). Here, the ALJ specifically stated that, "[a]fter considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below." (Tr. 48.) Thus, the Court finds that the ALJ did make an explicit finding regarding the weight he placed on Plaintiff's testimony regarding her subjective symptoms.

With regard to the ALJ's consideration of Sherisa's testimony about Plaintiff's functioning as an adult, the ALJ specifically noted Sherisa's testimony that Plaintiff has difficulties remembering how to play games and finishing chores, like dusting or doing the dishes. (Tr. 57.) Thus, the ALJ clearly considered Sherisa's testimony regarding Plaintiff's functioning since attaining the age of 18.

### III.    The ALJ's Consideration of PA Martin's Opinions

Plaintiff next asserts the ALJ erred in giving Physician Assistant Gabe Martin's opinions "little weight" and finding that his opinion is not supported by objective treatment records.

First, Plaintiff argues that PA Martin specializes in mental health despite the ALJ's statement that PA Martin "is a general primary care provider physician's assistant and not a specialist in the field of mental health." (Tr. 59.) Moreover, the ALJ favored Dr. Klug's opinion because he believed PA Martin was not a behavioral health specialist. Thus, the ALJ's factual error also undermines his analysis of Dr. Klug's opinions. Second, she argues, the ALJ failed to explain how PA Martin's opinion is inconsistent with his own objective treatment notes. Third, Plaintiff argues, the ALJ essentially cherrypicked exam findings from six of Plaintiff's 27 visits with PA Martin. Thus, it is unclear why the ALJ believed PA Martin's treatment records are inconsistent with his opinion. And fourth, Plaintiff contends, the ALJ's rationale is opaque with regard to his reliance on Plaintiff's daily activities and how those activities undermine PA Martin's opinion.

Again, the Court disagrees. As an initial matter, as the Commissioner points out, the regulations distinguish between "acceptable medical sources," medical sources who are not "acceptable medical sources," and "non-medical sources," for applications filed before March 27, 2017. 20 C.F.R. § 416.913. Only "acceptable medical sources," such as licensed physicians, can be characterized as treating sources whose opinions are generally entitled to controlling weight, while Physician Assistants are considered "other medical sources." 20 C.F.R. § 404.1513(a); SSR 06–03p. "Although the opinions of other medical sources are important and should be considered when evaluating 'key issues such as impairment severity and functional effects,' their findings cannot 'establish the existence of a medically determinable impairment.'" *Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010) (quoting SSR 06–03p)). Thus, even if the ALJ considered PA Martin to

be a mental health specialist, he did not err in giving more weight to the opinion of psychiatrist Fred Klug, Ph.D.

The Court also finds that the ALJ properly considered PA Martin's opinions from his "Medical Source Statement," in which he found Plaintiff has only moderate limitations in understanding and remembering short, simple instructions and marked limitations in carrying out short, simple instructions; interacting appropriately with the public; responding appropriately to work pressures in a usual work setting; and responding appropriately to changes in a routine work setting. (Tr. 599-600.)

The ALJ also properly considered records and treatment notes from Plaintiff's medical visits in finding that this opinion was not supported by his objective treatment records. The ALJ noted that Plaintiff received her mental health treatment for anxiety disorder, bipolar disorder, and ADHD from PA Martin. His mental status exams throughout 2015 and 2016 revealed she was well groomed, cooperative, her memory was intact, her mood was euthymic, and she had a pleasant affect. (Tr. 58.) While she began to complain of worsening mood swings in May 2016, PA Martin's exam showed she was cooperative, and her memory was intact. (*Id.*) Even when she stopped taking all medications due to her pregnancy, she continued to be cooperative, euthymic, and pleasant, and she maintained an intact memory and thought process. (*Id.*) Thus, the ALJ explained why he found PA Martin's opinion to be inconsistent with his objective treatment records.

The Court also is not convinced that the ALJ only reviewed or considered six of Plaintiff's 27 visits with PA Martin; a review of the entire record demonstrates that PA

Martin often found Plaintiff to be well groomed, cooperative, oriented to situation, euthymic, pleasant, and happy, with intact judgment.

The ALJ also was not opaque with his explanation as to why Plaintiff's activities of daily living undermined PA Martin's opinion. PA Martin found that Plaintiff had marked limitations in the ability to carry out short, simple instructions and the ability to make judgments on simple work-related decisions. Yet, Plaintiff testified that she takes care of her own personal care needs, cooks simple foods, and cares for her dog. (Tr. 81, 84, 88.) Thus, the ALJ did not err in finding PA Martin's opinion regarding Plaintiff's ability to carry out short, simple instructions and the ability to make judgments on simple work-related decisions to be unsupported.

## IV.   The ALJ's Step Five Finding

Lastly, Plaintiff argues the ALJ's RFC assessment was not based on all relevant evidence in the record. Plaintiff claims the ALJ failed to account for Plaintiff's documented need for frequent and ongoing prompts, guidance, and redirection to complete assigned tasks. In addition to Plaintiff's IEPs, which clearly identified her need to be prompted and guided while working on assignments, Plaintiff's mother testified that she needs to be reminded how to perform simple chores. Plaintiff asserts the ALJ also failed to discuss the hypothetical he gave the vocational expert regarding an individual who needed additional daily supervision and failed to discuss any testimony regarding Plaintiff's functioning as an adult.

The ALJ found Plaintiff has the RFC to perform a full range of work at all exertional levels but with a number of non-exertional limitations. He found she can

Page 22 of 24

understand and remember simple instructions and carry out only simple, routine, and rote-type tasks that require little independent judgment or decision making, in two-hour segments with a short 10- to 15-minute break between each segment. He also found she can perform tasks at an average production rate, but cannot handle tasks requiring stringent speed or strict rate-based production requirements or daily changes in a work task or work environment. He found that change must be introduced gradually, and there should be only occasional interaction with others, including the public, coworkers, and supervisors.

This RFC assessment is supported by substantial evidence. Plaintiff's subjective complaints, her mother's testimony, Plaintiff's IEPs, Ms. Garner's Teacher Questionnaire, PA Martin's examination notes, and Plaintiff's ADHD diagnosis all support the ALJ's conclusion that Plaintiff can perform simple, routine work that requires short, simple instructions and little independent judgment or decision making.

In making her argument, Plaintiff herself ignores evidence that she was able to stay on task for 97 percent of the time during her 2014 IEP evaluation, she exhibited appropriate social interaction, and she was able to follow directions and complete activities. (Tr. 487.) Her 2016 IEP also noted that Plaintiff completed all of her assignments when they were due, worked well with other students, participated in class discussion, and was "aware of her deficit areas and work[ed] hard to compensate for them." (Tr. 621.) She was noted to "sometimes" have difficulty staying on task and to "sometimes" need prompting. (*Id.*) In other words, while Plaintiff accuses the ALJ of only considering one side of the evidence, her own arguments do the same.

## CONCLUSION

After careful review of the record as a whole, the Court finds that ALJ committed no errors of law, and his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice**.

The Clerk of Court is **DIRECTED** to enter judgment accordingly and close this case.

**IT IS SO ORDERED.**

**DATED:   October 13, 2022**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**